(No. 83-CC-1933–<span></span>)
LANNY RUSSELL, Claimant, *v.* THE STATE OF ILLINOIS, Respondent.

*Opinion filed June 8, 1990.*

STRODEL, KINGERY & DURREE & ASSOCIATES (EDWARD R. DURREE, of counsel), for Claimant.

NEIL F. HARTIGAN, Attorney General (JAMES C. MAJORS, Assistant Attorney General, of counsel), for Respondent.

RAUCCI, J.

On July 23, 1982, Claimant was 14 years old. On that day, he was a resident at the Department of Corrections, St. Charles facility. Claimant was there for the purposes of a court-ordered evaluation. He had been to the St. Charles facility swimming pool approximately 10 times prior to July 23, 1982. Claimant testified that he had not received any instructions concerning the use of the pool at any time prior to the incident in question, other than the admonishment by a supervisor that there was to be no running.

Michael LaFever testified that prior to and on the date of the incident, he was a resident of the St. Charles facility. He testified he would have been at the swimming pool approximately 25 times prior to the incident involving the Claimant. On the date of the incident, a Mr. Anderson, one of only two supervisors in the pool area, instructed the residents that there was to be no running or jumping in the pool area. That was the only instruction given; no instructions were ever given to residents about there being a limited diving area or only being permitted to dive at the deep end of the pool or that there was to be no swimming and diving in the same

area. LaFever further testified that on July 23, 1982, he observed people just jumping into the pool from all over and, further, that he saw people diving into the deep end of the swimming pool from the side of the pool at the same time that people were diving from the end of the pool. No supervisors ever told any of the residents that they should be more careful while they were in the deep end of the pool.

LaFever further testified that on occasions prior to July 23, 1982, he had observed residents diving into the pool using the frame of an old diving board (the board had previously been removed). Further, he testified that on July 23, 1982, he saw residents diving from that frame, prior to Claimant's injury, and that the supervisor in the area was never heard to say that diving in that fashion was prohibited.

Claimant testified that prior to July 23, 1982, he had, while in the swimming pool area at the St. Charles facility, used the old diving board frame to dive into the pool. At no time prior to that date did he hear any supervisors tell any of the residents that they should not be diving off the old diving board frame.

Willie L. Mitchell was called to testify. He was presently employed by the Department of Corrections as a supervisor and was so employed on July 23, 1982. On the date in question, Mr. Mitchell was responsible for supervising the activities which took place in the swimming pool, as well as the gymnasium area. He testified that at the time of Claimant's injury, the only rules that were enunciated to the residents were that there was to be no running, dunking or horseplay. He testified that at no time prior to the injuries suffered by Claimant were the residents told or warned about diving where there was swimming going on; further, the

residents were never told that diving was prohibited in the deep end. He further testified that the residents were never, prior to July 23, 1982, given a "check out" on their swimming skills or safety knowledge prior to their first being permitted to use the pool.

Mitchell further testified that prior to the time of Claimant's injury, he had had no specific or additional training in regard to pool supervision or safety. Mitchell was not a certified lifesaver from the Red Cross at the time of the occurrence in question, nor was Anderson, the only other supervisor present at this point, a lifeguard or certified in any fashion from the Red Cross for lifesaving.

Mitchell testified that on July 23, 1982, there was no diving board in the pool area, but the old frame was still present and had not been roped off in any fashion. The only rules given to the Claimant and the other residents on the date of the occurrence would have been no running, horseplay or dunking. Otherwise, the residents, at that time, were allowed to swim at will. There were no other rules given to the residents orally at that time, and at the time of the occurrence at issue, the residents were allowed to swim wherever they wished, at will; further, the residents were permitted to dive into the pool anywhere they wished.

At the time of the occurrence in question, there were anywhere from 30 to 40 residents in the pool. LaFever testified that the only instructions that he had ever heard at any time prior to the incident involving Lanny Russell were that there was to be no running or jumping in the pool area. LaFever further testified that on the date of the incident in question, he had seen people diving into the deep end, prior to Claimant's injury, and that some of the residents were diving from

the side of the deep end while people were also diving from the actual end of the pool; he never heard Anderson admonish or advise people that they should not be doing that. LaFever also testified that in his experience, none of the supervisors ever administered any test to determine swimming ability of the people who got into the pool, nor did he hear them question any of the residents concerning their knowledge about diving safety.

Mitchell testified that he and Anderson were the only two supervisors in the pool area on July 23, 1982. Mitchell knew Anderson was there, but did not know what he was doing at the time the Claimant suffered his injury.

The Claimant testified that on July 23, 1982, he went into the pool area with the other residents for a scheduled recreational period and swam for awhile, alternating swimming and resting. Another resident asked him if he wanted to race and they got out of the pool and went to the deep end of the pool by the diving platform. They stood to either side of the diving platform, and as he prepared to get into the water, the Claimant testified he placed his left foot on the frame of the old diving board, the diving platform, and dived into the water, whereupon he collided with another resident. The Claimant testified that he now believes that the resident whom he collided with was coming up out of the water as he was going in.

Michael LaFever testified that he observed the Claimant jump off the diving board frame and, while in the air, collide with another student who ran and dived into the pool from the left side of the pool. After the collision, he observed the Claimant go to the bottom of the pool. This took place at approximately 4:00 p.m. on July 23, 1982.

Claimant testified that after the collision, he felt a tingling sensation and then realized he had no motor control. He was in the water, was pulled out and then lost consciousness.

LaFever testified he observed the Claimant floating near the bottom and dived down to get the Claimant and pulled him to the top. He testified that Anderson told him to get out of the water, but he ignored Anderson and went back down for the Claimant. He stated Anderson gave him a "write-up" for not getting out of the pool when Anderson told him to do so.

Claimant was initially taken to Geneva Community Hospital where an X-ray disclosed a dislocation of a cervical vertebra at C-3, C-4 level. Claimant had suffered a spinal cord injury (central cord syndrome) with a dislocation of C-3 and C-4. This resulted in quadriparesis.

Claimant was transferred to the Mercy Center for Health Care Services in Aurora, Illinois, after initial emergency room treatment in Geneva. He was treated by Dr. J. B. Mazur. The Claimant remained hospitalized at the Mercy Center from July 23, 1982, through September 1, 1982. While there, he was first placed in Gardner-Wells Tongs in an attempt to reduce the fracture without surgical intervention. Subsequently, on July 28, 1982, he underwent an anterior cervical interbody fusion with disectomy and bone grant from right iliac crest.

A subsequent surgery to allow drainage of the right hip region was necessitated on August 10, 1982, by reason of an infection in the iliac crest surgical site.

Claimant was, following surgery, placed on a physical therapy program. Initially, this process was

done at the Mercy Center Hospital in Aurora. Following release from that hospital on September 1, 1982, he was seen on an outpatient basis at the Institute of Physical Medicine and Rehabilitation in Peoria, Illinois.

Claimant testified that he now experiences trouble or pain lying on his side while sleeping, as well as muscle spasms in, primarily, his right arm. He also notices that his right arm has a "falling asleep" sensation. He experiences significant pain in his neck region when he now engages in normal work-type activities (*i.e.*, doing mechanical work on automobiles).

According to Dr. Thomas Szymke, director of the Institute of Physical Medicine and Rehabilitation, the Claimant is probably displaying symptomology, at the present time, of a pinched nerve or an arthritic process at the fracture site, with pain referred into his arm. A worst-case scenario is that there is actual encroachment or narrowing of the spinal canal where the spinal cord transverses the fracture site. The medical problems complained of by Claimant are of a permanent nature according to the evidence.

In this action based on negligence, Claimant had the burden of proving by a preponderance of the evidence that the State was negligent and that the State's negligence was a proximate cause of Claimant's injury. Also, as with any tort claim, Claimant must establish a *prima facie* showing of a duty by the Respondent, breach of Respondent's duty proximately causing Claimant's injury, and damages as a result thereof. We find that Claimant has met his burden of proof.

The common law doctrine of contributory negligence was abolished in Illinois by the case of *Alvis v. Ribar* (1981), 85 Ill. 2d 1. A plaintiff need no longer

prove freedom from contributory negligence, rather, a defendant carries the burden of pleading and proving contributory fault on the part of a plaintiff/claimant.

"° ° ° As the appellate court correctly held, both logic and fairness dictate that the defendant, who stands to benefit from a showing that the plaintiff was negligent, should have the burden of persuading the trier of fact on that issue. (Citation omitted.)

It would be anomalous to require that the defendant allege the plaintiff's negligence but to place the burden of proof on that issue on the plaintiff." *Casey v. Baseden*, 111 Ill. 2d 341, 345-47.

Thus, in the cause herein, the Claimant did not need to prove freedom from any contributory negligence to establish a *prima facie* showing. The Respondent did not meet its burden in the case at bar. Here the evidence establishes Respondent's negligence and that the negligence was the cause of Claimant's permanent injury.

The evidence establishes that Claimant was 14 years old at the time of this occurrence and that on July 23, 1982, he participated in a free swim recreational period at the St. Charles correctional facility. At that free swim, Respondent had two employees to supervise 30 to 40 boys in the pool area. One of the employees, Willie Mitchell, testified in this case.

Mitchell's testimony is significant. He establishes that neither he nor the other supervisor, Anderson, were trained in life safety or aquatic safety techniques at the time of this occurrence. Mitchell testified that the only rules given to the residents were that there should be no running, dunking or horseplay (and that was corroborated by the testimony of both Claimant and Michael LaFever) in the pool area. The students were allowed to swim at will and there were no admonitions given to the residents against diving and swimming in the same areas. By Mitchell's own testimony, the procedure

followed now is quite different. Now residents are warned against diving where there are swimmers and swimmers are first "checked out" on their swimming safety knowledge.

Claimant has affirmatively shown to this Court the necessary conduct regarding recreational pool safety and operation. Respondent failed to comply with required safety procedures.

Claimant presented Alan Caskey, Ph.D., as one of two witnesses on the question of the duty of the Respondent. Dr. Caskey is well credentialed in his field; part of his background included having been stationed at the U.S. Disciplinary Barracks, Fort Leavenworth, Kansas, as the recreation and athletic director. Dr. Caskey conducted an on-site examination of the pool at the St. Charles youth facility prior to giving testimony in this case. Dr. Caskey, familiar with the basic standards applicable to the use and operation of a recreational pool of the type in service on July 23, 1982, at the St. Charles correctional facility, stated that: "When you do diving, it must be separated from swimming activities, it must be supervised by a lifeguard, and only one person is allowed to dive off of the apparatus, platform or deck area at a time."

After being given a hypothetical question incorporating all facts which were subsequently placed into evidence, Dr. Caskey testified that the facility in question was operated in an unsafe manner.

"Q. What specifically would be your opinion was unsafe in the circumstances as described to you?

A. One, because of the depth no diving is to be allowed. Two, when diving is allowed it needs to be supervised by a lifeguard. The lifeguard would only allow one person to dive at a time into the diving area, would make sure that the area is clear before the second person is allowed to dive.

The type of stanchion or the diving board is not a proper diving platform. The amount of instruction and training given to the individuals in that type of a setting is inappropriate."

Dr. Caskey also testified that the unsafe conditions he described were the proximate cause of Claimant's injury. Dr. Caskey indicated that these failures: the lack of trained supervisory personnel, the lack of initial evaluation/training of the residents, the allowance of random diving where swimming was going on, as well as the use of the old diving platform, all combined to cause Claimant's injury. Of significance, as noted by Caskey:

"Q. Does random diving in a swimming area increase the risk of physical harm?

A. When an individual dives into an area that could contain other individuals the probability of striking an individual either above, at or below the water surface is greatly increased.

Q. Does your opinion incorporate any factors relating to the use of the— excuse me—the combined use of a pool for diving and swimming?

A. Well, all of the regulations and guidelines basically separate diving from swimming areas.

Q. And why is that?

A. Because of the historical amount of accidents and injuries that have been incurred when people have collided with or divers have collided with swimmers in a random diving in a swimming area."

Claimant also called William Sissel to testify. Sissel has had a lifetime of experience in the management and operation of recreational swimming pools. Sissel clearly stated that it was the obligation of an operation such as Respondent's of this type of recreational pool to prohibit combined swimming and diving in the same area. He also believed that the pool in question, at the time of Claimant's injury, was inappropriately supervised and that basic precautions such as warnings about swimming in a diving area and no diving being permitted off the side of the pool, were not given.

"The American Red Cross, which I base most of my working knowledge of the safety aspect of running a pool, clearly states that no one should be allowed to swim in a diving area and only diving should occur in this area. And after the dive then the individual should have a proper exit so as not to cross or impede someone else that may be entering the pool.

* * * I believe through previous managing, previous classes and standards set forth to me, that the pool was improperly supervised that day at best; the main reason for the lack of authorized certified personnel. I don't believe anyone had a certified water safety instructor's card or anyone was certified to be a lifeguard.

I think precautions should have been taken. * * * To read or to instruct the participants on the proper use of a pool. * * * In this case, no diving off the side of the pool, no swimming in the diving area. I think a test probably should have been given to ensure the swimming ability of those that are going to use the facility."

It was Sissel's opinion that the pool at the St. Charles facility on July 23, 1982, was being operated in a fashion that did not meet acceptable standards and that those failures, those breaches of the Respondent's duty, were a proximate cause of Claimant's injury.

Both Caskey and Sissel agree that the old diving frame was an unsafe piece of equipment that should not have been available for use by the residents. As Sissel noted:

"Q. And.what in your opinion, based upon reasonable standards that would govern the operators of such a pool, should be done with that type of piece of equipment?

A. Ideally should have been removed. It becomes what we would classify in physical education as an attractive nuisance.

Q. Explain that, please.

A. Something that is in itself inviting; something that kids * * * children would climb on, would try to use. And at best, instructions should have been given to these students to stay clear of this.

It would have been more appropriate to rope it off if it couldn't be removed, to mark it in such a fashion and to explain to the participants that this was indeed a broken piece of equipment that, at best, was unsafe."

The Claimant's evidence on the question of Respondent's negligence and that negligence being a cause or causing, in fact, Claimant's injury is, essentially, unrefuted. There is no testimony or evidence in the

record to contradict the evidence put before this Court by Alan Caskey and William Sissel. Furthermore, the testimony of the occurrence by witnesses clearly establishes the Respondent's failure to conduct the pool operations within the parameters of the minimal standards of care that would govern the operation of like or similar pools in 1982. Respondent's own pool supervisor established, against Respondent's interest, Respondent's failure to do those things which a reasonable prudent pool operator would do under like and similar circumstances.

The evidence concerning the injury to the Claimant is also unrefuted. As previously noted, Claimant suffered a dislocation of his cervical vertebra with an attendant spinal cord injury (a central cord syndrome). This necessitated, initially, use of Gardner-Wells Tongs on July 23, 1982, in an effort to reduce the fracture without requiring surgery. Subsequently, on July 28, 1982, an anterior cervical interbody fusion of C3-C4 with disectomy and bone graft from the right iliac crest was performed. Claimant underwent subsequent incision and drainage of the right iliac crest hip region for infection that developed, post-surgically. This was done on August 10, 1982.

Claimant was kept in the Mercy Center Hospital until September 1, 1982. During a great deal of that time following the surgery he was involved in an intensive physical therapy program. He was subsequently followed on an out-patient basis at the Institute of Physical Medicine and Rehabilitation in Peoria, Illinois, after his discharge from the Aurora hospital.

It is evident that Claimant suffered a great deal of pain and anguish during the period of time from his initial injury until his release from the Mercy Center

Hospital. Initially suffering from quadriparesis, he subsequently gained the use of his limbs after undergoing intense physical therapy. The physical therapy records clearly reflect the severity of Claimant's discomfort during this period of time. As previously noted, Claimant underwent a subsequent surgery to reduce infection at the right iliac crest donor site: that this was extremely painful is also clearly reflected in the records of Claimant's hospitalization.

The Claimant continued to improve and, at the time of trial, indicated he had sporadic pain in his neck with normal activity, as well as periodic episodes of spasm or tingling in his right arm region.

Dr. Szymke, who testified at trial, is the director of the Institute of Physical Medicine and Rehabilitation in Peoria, Illinois. He has stated that Claimant's current complaints are compatible with the type of injury and subsequent surgical procedure that Claimant suffered through. He further testified that Claimant's current problems are indicative of, at least, long term permanent arthritic involvement at the fracture site, if not actual encroachment of the spinal canal itself. The latter would necessitate eventual surgical treatment.

At the time of the occurrence in question, the Claimant was 14 years old. As noted hereinabove, Respondent has the burden of proving any contributory fault on the part of the Claimant. Respondent has failed to do that entirely.

The law in the State of Illinois is clear: a minor is not held to the same standard of conduct as an adult. In terms of ordinary care, a minor's conduct is examined by answering whether he comports himself with the degree of care which a reasonably careful minor of the age,

mental capacity and experience of the minor would use under circumstances similar to those shown by the evidence. See Illinois Pattern Jury Instructions, Civil, No. 10.05; *King v. Casaad*, 122 Ill. App. 3d 566.

There has been no affirmative showing on behalf of the Respondent that there was any contributory fault on the part of the Claimant; conversely, there has been an affirmative showing, by Claimant's evidence, that there was no contributory fault on his part at the time of his injury.

Claimant's injuries were severe. The surgical procedures necessitated to correct his injury have resulted in a fusion of the cervical vertebra at the site of the fracture along with excision of a portion of the intervertebral disk at that location. Claimant bears not only the physical scars of that procedure, but the mental scars as well. He will never be free from the residuals of the injury that he suffered as a result of Respondent's negligence.

The Claimant does not seek recovery of any medical bills in this action. This action was brought for the pain, suffering and permanent injury to Claimant. The Respondent should not be entitled to set-offs for medical bills. Even if the Respondent were to receive set-offs for medical services to Claimant, Respondent failed to prove that any of Claimant's medical bills had been paid by the State. The record is bereft of any such evidence of such a payment by the Respondent.

Claimant has met his burden of proof. Respondent has not. The preponderance of the evidence in this case clearly favors the Claimant. Respondent's negligence resulted in Claimant's injury.

It is therefore ordered, adjudged and decreed that

the Claimant be awarded the sum of fifty thousand dollars ($50,000.00) in full settlement of this claim.