MARY JEAN GREEN, Plaintiff-Appellee, v. UNIVERSITY OF CHICAGO HOSPITALS AND CLINICS *et al.*, Defendants-Appellants.

First District (1st Division)   No. 1—92—0070

Opinion filed March 8, 1994.

Cassiday, Schade & Gloor (Timothy J. Ashe and Lynn D. Dowd, of counsel) and Jenner & Block (Barry Sullivan and Jeanine M. Jiganti, of counsel), both of Chicago, for appellants.

Komessar & Wintroub, of Chicago (Mark S. Komessar, of counsel), for appellee.

JUSTICE O'CONNOR delivered the opinion of the court:

Defendants, the University of Chicago Hospitals and Clinics and Martin Robson, M.D., appeal from a $3 million judgment awarded to plaintiff, Mary Jean Green, for damages she sustained as a result of their negligent medical treatment. We affirm the judgment of the circuit court.

Plaintiff suffers from a congenital condition known as hemangioma. Hemangioma causes the expansion of blood vessels which results in tumors. The appearance of the tumors can change over a period of time; however, they render those with this condition susceptible to potentially life-threatening hemorrhaging. Plaintiff's hemangioma produced a tumor which affected the left side of her face, including her nose, the area around her ear, her upper lip, and a portion of her left eye. She described her tumor as resembling a "birthmark." Although she experienced frequent nosebleeds during her lifetime prior to 1978, she had not undergone any medical treatment for the condition.

In November 1978, plaintiff's nose began to hemorrhage after she was accidentally hit in the nose by a rolling pin during a family fracas. She could not control the bleeding, and paramedics eventually took her to Gary Medical Center in Gary, Indiana. There, doctors "packed" her nose and transferred her to the University of Chicago Hospital.

When she arrived, she was treated by Dr. Robson, who at the time was the chief of the division of plastic and reconstructive surgery and a specialist in congenital deformities. During her stay, Dr. Robson devised a multistaged plan to treat plaintiff's tumor. The aim of the plan was to "debulk" the tumor so as to decrease the risk of life-threatening hemorrhaging. During consultations in 1978, Dr. Robson explained to plaintiff that he might have to surgically remove her nose and reconstruct it. Robson also explained the procedure to her husband and her brother. In early 1979, plaintiff underwent the first stage operation in which Dr. Robson successfully removed the part of the tumor from underneath her nose without having to remove any portion of her nose.

After the 1979 surgery, plaintiff continued to suffer from nosebleeds. Her appearance remained generally unchanged from before except that some of the flesh from the top of her nose was disfigured due to the nose packing she had received in the Gary hospital. In October 1982, she returned to Dr. Robson to proceed with the next stage of surgery. The aim of the second surgery was the partial removal of that portion of the tumor which affected her cheek. According to plaintiff, Dr. Robson did not warn her that the surgery presented a risk of disfigurement. Had he done so, she would not have gone through with the procedure. She claimed that the consent form that she had signed prior to the surgery had been "altered."

The surgery took place on October 4, 1982. Following the operation, plaintiff experienced severe swelling to the affected area, which decreased during her stay in the hospital and which continued to decrease after her release. At a routine check-up three months later, Dr. Robson noted a decrease in the swelling. Plaintiff never returned to Dr. Robson for any further care.

In 1984, she filed suit against both Dr. Robson and the hospital, alleging that various deviations from the standards of the profession resulted in numerous and unsightly facial scars and deformity.

Dr. Robson testified that plaintiff's facial scarring was not related to the 1982 surgery because he would have noted it in his post-operative evaluations. He believed the enlargement of the tumor near her lip was caused by the natural disease process normally associated with hemangioma. The part of the tumor affecting her lip had not been scheduled for surgery in 1982. Dr. Robson also noted that plaintiff had undergone laser surgery on her lip which had been performed by another doctor in 1989. Dr. Robson stated that this type of procedure could have caused the tumor's enlargement. Dr. Robson stressed that the removal of the tumor was still possible through further surgery which would likely produce a "good result." He added that there was no recurrence of tumors in the areas of plaintiff's face on which he had operated.

Plaintiff's medical expert, Dr. Marc Karlan, testified that based on his review of plaintiff's medical records, Dr. Robson failed to secure informed consent from her. Moreover, in Dr. Karlan's opinion, the surgery was not indicated because her condition was not life-threatening in 1982; thus, Dr. Robson deviated from the standard of care by performing the operation. Karlan further stated that even if Dr. Robson had performed the surgery for cosmetic reasons, which would not be negligent *per se*, Robson deviated from the standard of care by not performing a total resection or removal of the tumor during the second operation. Dr. Karlan attributed the changes in plaintiff's appearance to the surgery or the healing process.

Plaintiff also presented the expert testimony of Dr. Michael Goldman, who had performed the unsuccessful laser surgery on her lip in 1989. Dr. Goldman stated that the laser surgery did not exacerbate her condition. Rather, it was Dr. Robson's 1982 surgery which caused plaintiff's tumor to change and become enlarged. However, Drs. Goldman and Karlan conceded that a tumor like hers could remain stable for a long period of time and suddenly enlarge. Both admitted that the tumor could have changed by itself, independent of any effect from Dr. Robson's operation. Defendants' medical expert, Dr. Raymond Warpeha, reviewed plaintiff's medical records and concluded that she had been informed of the risks of the surgery. Dr. Warpeha stated that the 1982 operation conformed to the standard of care because plaintiff's intermittent bleeding indicated that surgery was advisable. Warpeha described her tumor as "progressive," meaning that it could enlarge over time in an unpredictable manner.

The circuit court denied defendants' post-trial motions, and this appeal followed.

Defendants first allege that plaintiff's counsel engaged in improper conduct throughout the trial and made inflammatory remarks during closing argument.

■ We preface our discussion of this issue by noting that a closing argument must be clearly improper and prejudicial to warrant reversal of the judgment. (*Boasiako v. Checker Taxi Co.* (1986), 140 Ill. App. 3d 210, 488 N.E.2d 672.) A party may not claim error based on invited remarks, and errors not objected to at trial are deemed waived. (*Tzystuck v. Chicago Transit Authority* (1988), 124 Ill. 2d 226, 529 N.E.2d 525; *Daniels v. Standard Oil Realty Corp.* (1986), 145 Ill. App. 3d 363, 495 N.E.2d 1019.) In determining whether a party has been denied a fair trial because of the opposing party's closing argument, we must give considerable deference to the trial judge's decisions because he is in a superior position to assess the accuracy and impact of counsel's statements. *Lawing v. Chicago Transit Authority* (1986), 142 Ill. App. 3d 119, 491 N.E.2d 145.

■ Defendants complain of opposing counsel's reference to Dr. Robson as "Dr. Frankenstein" and of counsel's statement that Dr. Robson "lied" about his record keeping and "didn't even have the guts to tell you." Additionally, they take issue with counsel's remark that Dr. Robson's "ego as a great surgeon wouldn't allow him to speak the truth." Furthermore, counsel's reference to the "Hunchback of Notre Dame" and the "Phantom of the Opera" to illustrate the isolation plaintiff felt as a result of her disfigurement also is cited by defendants as inflammatory. Defendants further object to counsel's remark that "we are all in the grip of *** the physician who has superior knowledge and can out-talk us and oftentimes out-think us."

We have carefully reviewed the closing arguments made by both parties. None of the remarks, when examined in their full context, rise to the level of reversible error. In fact, much of defendants' argument misrepresents the record, particularly concerning the "Dr. Frankenstein" reference.

■ Defendants also argue that counsel's remark that "if you find that Dr. Robson wasn't negligent *** everybody's off the hook" was an improper reference to insurance. We disagree.

The record reveals that, in explaining the concept of *respondeat superior*—the basis of any liability on the part of the hospital defendant—plaintiff's counsel stated:

> "You will be instructed by the Court that Dr. Robson was an employee of the University of Chicago Hospitals and as such, if you find that Dr. Robson acted negligently in this case, then automatically University of Chicago as his employer is also liable.
>
> On the other hand, if you find that Dr. Robson wasn't negligent as a matter of law in this case, everybody's off the hook. It's all or nothing."

Generally, in cases where the existence of insurance is noted in closing argument, counsel specifically mentions insurance or alludes to a third party who would be the source of funds in the event of liability. (See, *e.g.*, *Panelle v. Chicago Transit Authority* (1964), 31 Ill. 2d 560, 202 N.E.2d 484; *Kavanaugh v. Parret* (1942), 379 Ill. 273, 40 N.E.2d 500; *Reed v. Johnson* (1965), 55 Ill. App. 2d 67, 204 N.E.2d 136.) We fail to discern any implication of the existence of insurance from the statement quoted above.

■ ■ Defendants assert that counsel's reference to defendants' medical expert as a "paid gun" warrants a new trial. Once again, however, the record suggests a scenario different from that represented to this court by defendants. The remark was not directed at defendants' expert; rather, it referred to one of plaintiff's own witnesses, Dr. Karlan. The cases cited by defendants in this argument are not persuasive as they address inflammatory remarks directed at the opponent's expert. Finally, defendants contend that opposing counsel's courtroom demeanor, which consisted of throwing his glasses down, slamming doors, and stalking around the courtroom, unduly influenced the jury. In fact, defendants objected to most of the behavior now complained of here, and, at one point, unsuccessfully moved for a mistrial. A trial judge's decision on such matters is accorded great deference on appeal. (*Bisset v. Village of Lemont* (1983), 119 Ill. App. 3d 863, 457 N.E.2d 138.) The attitude and demeanor of counsel, as well as the atmosphere of the courtroom, cannot be reproduced in the record. As a result, we yield to the trial

judge's singular position of assessing and determining the impact of improper conduct on the part of counsel.

■ Defendants' remaining claims challenge the instructions submitted to the jury. Generally, a party is entitled to have the jury instructed on her theory of recovery if the facts in evidence or a reasonable inference from those facts support that theory. (*Aimonette v. Hartmann* (1991), 214 Ill. App. 3d 314, 574 N.E.2d 776.) Moreover, the circuit court is vested with the discretion to determine which instructions shall be given, and the exercise of that discretion will not be disturbed upon review unless it has been clearly abused. *Hollembaek v. Dominick's Finer Foods, Inc.* (1985), 137 Ill. App. 3d 773, 484 N.E.2d 1237.

Plaintiff's instruction No. 13 stated:

"The plaintiff claims she was injured and sustained damage, and that defendants were negligent in one or more of the following respects:

1) failed to obtain an informed consent to the surgery performed upon Mary Green's face on October 4, 1982;

2) performed a partial excision of facial hemangioma upon Mary Green's face on October 4, 1982, when there was no medical indication for the surgery;

3) performed a partial excision of facial hemangioma upon Mary Green on October 4, 1982 when her disfigurement was probable."

Defendants argue that subsection (3) is fatally ambiguous because it improperly implies that a bad result in and of itself (the disfigurement) constitutes medical malpractice.

Although we agree with defendants that proof of a bad result or mishap or proof that a good result was not achieved is not proof that a doctor deviated from the requisite standard of care (*Spidle v. Steward* (1980), 79 Ill. 2d 1, 402 N.E.2d 597), we disagree with defendants' characterization of the instruction. A literal reading of subsection (3) clearly states that the allegation of negligence is that Dr. Robson performed the wrong type of procedure, a partial excision, because as the expert evidence showed, that procedure was the probable cause of the worsening of plaintiff's condition.

Defendants also assert that the following note sent to the trial judge by the jury underscores the confusing nature of the instruction:

" 'The defendants were negligent in one or more of the following respects.' When you say '(3) performed a partial excision ... when worsening her disfigurement was probable,' do you mean that performing more than likely will result in a worsening of her disfigurement and that the defendant was aware of that?"

In our opinion, the jury's inquiry indicates that the jury realized that the essence of the negligence claimed here was that Dr. Robson

performed the surgery when he knew that it would likely make plaintiff's condition worse. Moreover, we note that both parties' attorneys agreed to the trial judge's response to the jury that it had heard all the evidence and should continue to deliberate. Accordingly, the trial judge did not abuse his discretion in giving the instruction.

■ Defendants also maintain that the circuit court committed further error by refusing to give the jury Illinois Pattern Jury Instructions, Civil, No. 105.08 (2d ed. 1981), which, in substance, tells the jury that plaintiff had a duty to mitigate damages by following the medical advice given by Dr. Robson. In fact, the evidence showed that plaintiff failed to return for follow-up treatment after the 1982 operation, despite the fact that prior to the operation, Dr. Robson had scheduled further appointments to monitor the affected area of her face. The circuit court refused to give the instruction, ruling that defendants had not alleged the affirmative defense of contributory negligence.

Although in medical malpractice cases a patient cannot claim damages that result from her own failure to follow her doctor's advice (*e.g.*, *Corlett v. Caserta* (1990), 204 Ill. App. 3d 403, 562 N.E.2d 257; *Haering v. Spicer* (1900), 92 Ill. App. 449), a defendant must plead and prove a plaintiff's failure to mitigate damages. (*Nancy's Home of the Stuffed Pizza, Inc. v. Cirrincione* (1986), 144 Ill. App. 3d 934, 494 N.E.2d 795.) Here, defendants failed to plead this defense, and they now contend that the circuit court should have permitted them to amend their answer to do so. The circuit court retains the discretion to decide whether to allow such amendments after considering the timeliness of the amendment and whether the opponent will be prejudiced or surprised. (*American Pharmaseal v. TEC Systems* (1987), 162 Ill. App. 3d 351, 515 N.E.2d 432, *appeal denied* (1988), 119 Ill. 2d 553, 522 N.E.2d 1240.) Generally, there is no absolute right to amend an answer, and amendments are not favored after the commencement of trial. *DiBenedetto v. County of Du Page* (1986), 141 Ill. App. 3d 675, 491 N.E.2d 13.

Defendants sought to amend their answer in 1991, on the eve of trial, arguing that the deposition of Dr. Karlan, taken some 60 days before, suggested that plaintiff's failure to return to Dr. Robson did not help her condition. However, defendants were aware from the outset of the litigation that plaintiff did not return for further consultation. No reason was offered as to why this defense was not asserted earlier. Based on this record, we cannot disturb the circuit court's ruling on this matter.

The judgment of the circuit court is affirmed.

Affirmed.

CAMPBELL, P.J., and BUCKLEY, J., concur.