(Nos. 93-CC-3197, 93-CC-3198, 93-CC-3199 cons.—

ENTERTAINMENT SPECIALISTS LTD., INC., GARY LASHINSKY and ELIZABETH LASHINSKY, Claimants, *v.* BOARD OF GOVERNORS OF WESTERN ILLINOIS UNIVERSITY, Respondent.

*Order filed April 20, 1998.*

*Opinion filed July 24, 1998.*

*Order on petition for reconsideration filed December 18, 1998.*

ROBERT A. BARASA and JOHN F. CUSHING, III, for Claimants.

DUNN, GOEBEL, ULBRICH, MOREL & HUNDMAN (DAVID L. STANCZAK, of counsel), for Respondent.

ORDER

JANN, J.

This cause comes on to be heard on Respondent's post-trial motion for leave of court to file affirmative defenses and conform the pleadings to the proofs. Claimant has responded. The Court being fully advised in the premises finds:

Claimant brought three separate complaints, each alleging a cause of action in tort relating to the death of a Lipizzaner stallion. The Court, by its own motion, hereby consolidated these causes which arose of the same circumstances and incident as Cause No. 93-CC-3197.

Claimant's complaints seek a total of $300,000 ($100,000 for each animal) for the demise of the stallions while performing at Western Illinois University (WIU), Macomb, Illinois, on October 9, 1992. The animals ingested toxic plants on WIU premises.

The complaint in this matter was filed May 21, 1993. The trial was commenced on May 1, 1996, and all proofs closed and parties rested on October 17, 1996. A briefing schedule was set and Claimant and Respondent filed their briefs and Claimant's reply on April 21,1997, June 20, 1997 and August 18, 1997 respectively. Yet, on August 20, 1997, more than ten months after the parties rested, the Respondent filed their motion for leave of court to file the affirmative defense of comparative negligence.

Section 2—616(a) of the Code of Civil Procedure provides that "(a) At any time before final judgment amendments may be allowed on just and reasonable terms * * *." 735 ILCS 5/2—616(a).

The issue before the Court is interpretation of "just and reasonable terms."

Respondent urges the Court to exercise discretion and allow Respondent to amend its answer to conform with the pleadings and more clearly define the issues.

The law is clear that there is no absolute right to amend an answer and it is not favored as trial commences. *DiBenedetto v. County of DuPage* (2nd Dist. 1986), 141 Ill. App. 3d 675, 96 Ill. Dec. 199, 204, 491 N.E.2d 13, 18.

Illinois courts have consistently refused to allow defendants to amend their answer to allege contributory negligence during the trial phase of the proceeding where the Respondent failed to assert a persuasive explanation for failing to raise the defense during the months preceding and during the trial. See *American Pharmascal v. TEC Systems* (2nd Dist. 1987), 161 Ill. 3d 351, 113 Ill. Dec. 623, 515 N.E.2d 432 (defendant not permitted to inject two new theories, including claim of contributory negligence, by way of an amended answer at the close of the plaintiff's case without satisfactory explanation for failure to raise defenses during four-year period litigation was pending); *Mayfair Construction Company, Inc. v. Security Insurance Company of Hartford* (1st Dist. 1997), 51 Ill. App. 3d 588, 9 Ill. Dec. 509, 513, 366 N.E.2d 1020 (defendant not permitted to assert affirmative defense after plaintiff rested case at trial without persuasive reason for delay when defendant knew facts constituting affirmative defense); *Green v. University of Chicago Hospitals and Clinics* (1st Dist. 1994), 258 Ill. App. 3d 536, 197 Ill. Dec. 268, 274, 631 N.E.2d 271 (defendants not permitted to amend to assert plaintiff's contributory fault on eve of trial where defendants were aware of facts from outset of litigation and no reason offered as to why defense not asserted earlier); *Carlisle v. Harp* (5th Dist. 1990), 200 Ill. App. 3d 908, 146 Ill. Dec. 355, 558 N.E.2d

318 (defendant not permitted to amend to assert plaintiff's contributory negligence after trial began where record indicated defendant knew facts and was mistaken about need to raise affirmative defense); *Johnson v. Abbott Laboratories, Inc.* (2nd Dist. 1992), 238 Ill. App. 3d 890, 179 Ill. Dec. 84, 605 N.E.2d 1098 (defendant not permitted to amend to assert affirmative defense on day trial commenced where no apparent reason why defense not presented earlier during one and one-half years case was pending, defendant had ready access to relevant information, and defendant offered no reason for delay).

We have also held that other defenses which are nonjurisdictional but conditions precedent to pursuing a cause before this Court are considered waived if not asserted prior to trial. *Wilson v. State* (1994), 46 Ill. Ct. Cl. 20.

As Claimant is no longer required to plead freedom from contributory negligence under Illinois law, the burden to plead and prove contributory negligence lies with Respondent. *Russell v. State* (1990), 42 Ill. Ct. Cl. 83.

Respondent had approximately 3 years from the filing of Claimant's complaint to hearing to assert contributory negligence. The facts herein are not indicative of newly discovered evidence or facts unknown to Respondent prior to trial which might support the granting of Respondent's motion.

In their objection to Respondent's motion to amend, Claimant persuasively argues that Respondent's untimely attempt to amend their answer alters the nature of proof required and results in surprise and prejudice to the Claimant. Clearly, it is patently unfair to Claimant to allow Respondent to amend in this final hour just prior to judgment, as Claimant has had no opportunity to properly refute the allegations. It would be especially unfair to

grant the motion in light of the fact that Respondent never offered any reason for its failure to amend in a timely fashion.

To allow Respondent to amend and assert affirmative defenses at this late date would result in unfair surprise and prejudice to Claimant. Respondent's motion must therefore be denied.

We note that both parties requested oral argument upon submission of post-trial briefs. However, it is unclear to the Court whether argument is presently desired or necessary in light of our ruling herein. The parties are advised that the commissioner has forwarded her recommendation and trial transcript along with the parties' briefs for our consideration, in addition to the prior submissions of record. We are prepared to make a ruling based upon the record.

The parties are requested to advise the Court within 15 days of entry of this order if they desire oral argument. If no such notice is given, the Court shall rule upon the record without further proceedings.

## OPINION

JANN, J.

Claimants brought three separate complaints, each alleging a cause of action in tort relating to the death of a Lipizzaner stallion. The three horses were alleged to have died as a result of ingesting toxic Japanese yew plants which were owned and maintained by State agents at a State-owned and operated facility where the horses were performing in a show. The Claimants seek judgment in the maximum amount of $100,000 for each stallion for a total aggregated claim of $300,000.

Respondent filed a post-trial motion to assert affirmation defenses, most notably, contributory negligence. Respondent's motion was denied by our order of April 20, 1998.

## Facts

### Claimant's Case

Gary and Elizabeth Lashinsky own and operate a company called Entertainment Specialists, Ltd., which produces and tours a show nationally and internationally called "The Wonderful World of Horses," featuring royal Lipizzaner stallions. The royal Lipizzaner stallions are rare, unique horses bred and trained to perform unusual and difficult moves for entertainment purposes. Of the fewer than 100 Grand Prix trained Lipizzaners in the world, Claimant owns about a dozen. Horses of this type and trained at that level are valued at approximately $500,000 according to the testimony. The three horses at issue in this case are named Darinka, Bella Mia, and Regina.

On October 9, 1992, the Wonderful World of Horses was scheduled to arrive and perform at Western Illinois University, Macomb, Illinois (hereinafter referred to as "WIU"). Elizabeth Lashinsky testified that, in the weeks preceding the show, a technical requirements list was forwarded to the contact person at WIU. WIU was further notified that the show required a place to hose down and clean or groom the horses prior to their appearances.

On October 9, 1992, the horses arrived at WIU by trailer at about 5:30 p.m. and began preparation for an 8:00 p.m. show. Billie Hoyt, tour manager for Claimant advised the WIU agent attendant that a water supply and a private area to clean and prepare the horses was needed.

The WIU agent directed Claimant to a designated wash area where the horses were to be washed, which

was outside the Western Hall facility next to some bushes and a spigot where Claimant connected their hoses. Each horse was washed, tied, groomed and left standing by agents of the Claimants. (Western Hall is an arena-type facility for sports, concerts and other shows.)

That night, during and following the performance, Darinka, Bella Mia, and Regina died. Regina collapsed a little over an hour into the show. The show was terminated, and the other three horses on the stage were sent backstage. A few minutes later, Regina died. Darinka collapsed backstage and died very quickly. The other horses were loaded on the trailer and taken to stables. Around 2:00 a.m., Bella Mia died at a Macomb stable.

Autopsies were performed on the three horses and it was determined the horses had ingested toxic Japanese yew plants. The same type of yew plants were located in the area where the horses had been groomed outside Western Hall.

Claimant produced Ronald Trace, a landscape architect and qualified expert in the area of toxic effects of certain vegetation. Mr. Trace identified the authoritative treatise in the area of woody landscape plants as Michael Dirr's "The Manual of Woody Landscape Plants." The fourth edition of Dirr's book contained a passage under the yew genus "taxus" which was read into the record as follows:

"Yews are among the most toxic of plants. They appear to be poisonous all seasons of the year. The toxic principal is taxine. Foliage, bark or seeds, whether dry or green, are toxic to people and to all classes of livestock."

Dirr's book also reported that cows had been observed to have died from eating very small amounts of yew foliage.

Trace also cited, "A Field Guide to Trees and Shrubs" and "A Field Guide to Edible Wild Plants," produced

respectively by the National Audubon Society and the National Wildlife Federation. The latter book classified the yews "poisonous" and showed a skull and crossbones next to the words "American yew." Under this section describing the plant, it says, "Warning: the seeds themselves and the wilted foliage contain the heart depressing alkaloid taxine." Based upon the prevalence of these publications and the common use of yews in landscaping, Trace was of the opinion that the WIU, which had a horticulture school, did have, or should have had, information on the toxicity of the Japanese yew.

Like other yews, the Japanese yew, an import from Asia and parts of Europe, contains taxine, which acts as a heart depressant. Trace, long an owner of horses himself, was aware that a horse's ingestion of Japanese yew could cause death. Based on Trace's personal knowledge and the published material, Trace opined that it is commonly known that horses must be kept away from yews and their toxin. He testified that horses like to eat frequently and a lot, and proximity to yews coupled with the lack of more attractive forage presents a danger of ingestion.

## The Respondent's Case

Dr. Charles Spencer, Dean of the College of Health, Physical Education, and Recreation at Western Illinois University, testified for Respondent. As dean, Spencer was responsible for the University's Western Hall facility which was used for concerts, circuses, athletic events, and other performances. Spencer acknowledged that Western Hall was leased by Entertainment Specialists on October 9, 1992. Entertainment Specialists indicated its needs in its contract, Claimants' exhibit C. Spencer was the contact person for this show on behalf of WIU.

A few days before the show, Entertainment Specialists called and asked for an available area in Western Hall

to wash the horses. Spencer said there was no water available in the facilities, but directed them to a spigot on the east side of the building, the only one on the exterior of the building. Respondent's exhibit 2, a floor diagram of Western Hall showing the location of the yew plants and water spigot, revealed that the spigot attached to the side of the building was located directly between and behind two yew plants. A parking lot was immediately adjacent to the east side of the building.

Spencer knew yew plants were growing along the east and north sides of Western Hall as part of its landscaping. The yews had been there since at least 1988.

Spencer was present on October 9, 1992, when the horses arrived, and he saw them being washed and groomed in a restricted area. Spencer first learned about the toxicity of the yew plants after being notified of the autopsy results. He testified that if he had known of their toxicity, he would have considered the adjacent area to be unsafe and would not have allowed the horses to be cleaned there.

Spencer testified the university had an agriculture department that involved livestock and that the livestock did not graze in the vicinity of Western Hall. The University's animals were confined to the exterior of the campus on a farm two miles away from the Hall.

Dr. Jon Wolf, a professor in the horse science program at Black Hawk College in Kewanee, Illinois, testified for Respondent. Black Hawk College offers an associate's degree in horse or equestrian science.

Dr. Wolf testified that a long list of weeds, plants, and trees can cause colic or death in horses. Black Hawk students were instructed about some of the common toxins found in pastures and crop areas as part of their curriculum.

Dr. Wolf testified that he also teaches them that a horse may be tied up only if the environment is "totally safe." A horse should not be tied up in an area where foodstuffs are uncertain or the environment cannot otherwise be identified as totally safe by its handler or rider.

Dr. Wolf agreed that washing a horse requires the use of a spigot, that it is perfectly acceptable to wash a horse on a grassy area, and that he had seen that done on farms. While he would expect a horse to prefer grass over Japanese yew, that preference might not prevail when grass is no longer growing, as in the fall, or when a horse is curious, bored, or has watched another horse nibble at the yew. Dr. Wolf stated that horses have no instinctive knowledge that something is toxic.

Dr. Wolf testified that a number of equine nutrition books have a chapter on poisonous plants. In fact, Dr. Wolf found an article in one of his own magazines on yew plants that said they are highly poisonous and that horses should not be allowed to get near them.

## The Law

The law is well established that there are three elements to recovery sounding in tort: a legal duty by defendant to plaintiff, a breach of that duty and damages proximately resulting from that breach. *Ordes v. State* (1991), 43 Ill. Ct. Cl. 272.

The Claimant asserts a duty owed by Respondent pursuant to invitee status. An invitee is defined as one who enters the premises of another with the owner's express or implied consent for the mutual benefit of the invitee and owner. (*Rhodes v. Illinois Central Gulf Railroad* (1966), 172 Ill. 2d 213, 216 Ill. Dec. 703, 711, 655 N.E.2d 1260.) When the State occupies and takes charge of property, it is bound to use reasonable or ordinary care and

prudence to keep it reasonably safe for the benefit of those who come upon it as invitees. (*Peters v. State* (1984), 36 Ill. Ct. Cl. 255, 257; *Lambatos v. State* (1992), 44 Ill. Ct. Cl. 238.) The existence of the legal duty imposes a standard of reasonable care and requires more than a possibility of an occurrence. The harm must be foreseeable. *Ma v. State* (1993), 45 Ill. Ct. Cl. 180.

Claimant argues that the standard of ordinary care is heightened due to the fact that the Respondent, as occupier of the premises, is expected to have superior knowledge of the premises' condition and that the Respondent is held to a higher standard of knowledge of defects in the premises than is an invitee. Claimant argues that the State has a duty to remedy or warn of a defective condition notwithstanding the fact that it had no actual knowledge of the condition, because the condition should have been discovered in the exercise of reasonable care. *Peters v. State* (1984), 36 Ill. Ct. Cl. 255.

Claimant urges the Court to accept as fact that, given the toxicity of the plants, the Respondent could have discovered the danger through ordinary care.

In this case, it is clear that the Respondent owed Claimant a duty of reasonable care; however, Respondent need not anticipate every danger. It is undisputed that the yew bushes are commonly used in landscaping. The danger the yew bush poses is not unique to Respondent's property, as they are commonly used in landscaping. The yews in this location had been growing around Western Hall since at least 1988. During that time, despite using Western Hall for 20 to 25 events each year, there is no documented case of any person, child or animal having fallen ill from eating yews. The history of usage of the facility also included performances by the Shrine Circus which featured large animals and suffered no similar tragedy.

There exists an assumption that the property owner is more familiar with the property than a visitor. The property owner is, therefore, likely to be more familiar with any dangerous condition on the property. It is this presumed unequal knowledge, particularly in situations where the visitor to the property is unlikely to appreciate the danger, that is the basis for the creation of the assumed duty. *Tuley v. State* (1995), 47 Ill. Ct. Cl. 396.

In *Wotiz v. Gruny* (5th Dist. 1996), 281 Ill. App. 3d 50, at 52, 667 N.E.2d 102, the Court held that:

"* * * no one is expected to guard against harm from events which are not reasonably anticipated at all or are so unlikely to occur that the risk, although recognizable, would commonly be disregarded. (*Cunis v. Brennan* (1974), 56 Ill. 2d 372, 376, 308 N.E.2d 617, 619; *West v. Faurbo* (1978), 66 Ill. App. 3d at 819, 384 N.E.2d at 459.) The creation of a legal duty requires more than a mere possibility of occurrence. *Cunis* (19   ), 56 Ill. 2d at 376, 308 N.E.2d at 619 * * *."

Furthermore, the Fifth District Appellate Court held, in *Hodges v. St. Clair County* (5th Dist. 1994), 263 Ill. App. 3d 490, 636 N.E.2d 67, 200 Ill. Dec. 876, as follows:

"A duty to warn of a particular hazard will be imposed only where there is unequal knowledge, either actual or constructive, and the defendant knows or should know that injury may occur if no warning is given. 263 Ill. App. 3d 490, 492."

Claimants urge the Court to impute the knowledge of the yews' toxicity to the Respondent because WIU has an agriculture department which teaches horticulture, and therefore must have faculty members who are familiar with yews' toxicity. However, although the university does have an agriculture department, there is nothing in the record to indicate the existence of persons at the university knowledgeable in the area of horticulture or toxic plants. Furthermore, Spencer testified that he personally knew nothing of the yews' toxicity until this incident. In fact, neither the Claimant, Gary Lashinsky, nor any of his professional staff was aware of the danger of the plant prior to this incident.

The yew plants did not constitute a hidden danger that was known only to the Respondent. They were in open view, as visible to the Claimants and their employees as to the university and its employees. See *Alcorn v. Stepzynski* (3rd Dist. 1989), 185 Ill. App. 3d, 540 N.E.2d 823, 132 Ill. Dec. 901; *Mullen v. Board of Trustees of University of Illinois* (1985), 38 Ill. Ct. Cl. 44.

Foreseeability of the danger requires knowledge, not only of the toxicity of the yews to animals, but also of the horses' propensity to nibble at them. The latter is more within the expertise of the individual Claimants who have been in the business of training and showing horses for approximately 27 years. In that time, they have developed great expertise in caring for and training horses. They also testified that their head trainer, Andrea Spencer, who is very knowledgeable on how to keep horses healthy was with the traveling show at the university when the horses died. Respondent's expert, Jon Wolf testified that horses are known to nibble at everything, and that persons familiar with horses learn to keep horses away from anything they might nibble at that is not in their diet. They are taught not to tie them up except in a totally safe environment. If they are unfamiliar with any plants at the location, the horses should not be tied up there.

By contrast, Charles Spencer of the university had no background in either equine eating habits, training or care, or in horticulture and toxicity of plants. Clearly, the persons familiar with horses, their eating habits and dietary needs are in the better position to recognize the danger posed by the Japanese yews, rather than the university, whose dealings with animals of any kind at Western Hall is limited. The university did not possess the superior knowledge of a danger in this case which could impose a duty upon the university to protect the Claimants' horses.

There is no evidence that Respondent had knowledge of a potentially dangerous condition in the Japanese yew bushes. Respondent did not have actual or constructive notice and had no reasonable expectation of the danger at issue. Claimants have failed to establish Respondent's breach of its duty of reasonable care owed to Claimants.

Although this Court must acknowledge the tragedy of the Claimants' loss, legal liability for the loss does not rest with the Respondent State of Illinois. These claims must be denied.

## ORDER

JANN, J.

This cause coming before the Court on the motion of the Claimants for reconsideration; due notice having been given and this Court being fully advised:

It is hereby ordered that:

Respondents have filed a response opposing Claimant's petition for reconsideration. Claimants filed a reply.

The Court has carefully reviewed the record herein and finds as follows:

1. Claimants assert the Court erred in applying the appropriate tort law to this cause. Claimants' contention is that the Court chose to imply a personal injury standard regarding invitees to State property rather than a property damage standard.

2. Claimant at no time prior to post-trial arguments raised said argument and its argument's focus upon its status as an invitee.

3. Claimants assert creation of a bailment by the State which is not supported by the record.

4. If a bailment were assumed arguendo, Claimant has failed to prove that the State violated its presumed duty of *ordinary* care.

5. Claimants' arguments as to the relative duties of the parties as regards foreseeability of harm are, at best, tenuous and fly in the face of common sense. Any reasonable person with 27 years of experience in equine husbandry must assume some responsibility for rudimentary knowledge in the care of particularly rare and valuable creatures in his care. No ten-year-old 4-H member would allow an animal to freely graze in unfamiliar territory.

6. Claimants failed to prove their allegations regarding their alleged inability to inspect and reject the grooming site. We are asked to imply a contract of adhesion. The proofs indicate Claimants had no written agreement indicating a "horse-proof" environment for grooming. Claimants rely upon oral agreements concerning a convenient location and ask that responsibility be imputed to Respondent based upon Claimants' desire in part to avoid property damage to lawns or other property of the lessor. Claimants essentially seek to impute liability for a tragic loss of truly noble beasts which were *shamefully* neglected by their handlers. Simple nose baskets in common usage by far less experienced horsemen on far less regal horses would have prevented this incident.

Our previous order denying these claims is affirmed and the petitions for reconsideration are hereby denied. These causes are dismissed with prejudice.